1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE STANDARD FIRE
INSURANCE COMPANY,

                    Plaintiff,

          v.

PORT OF BELLINGHAM, et al.,

                    Defendants.

C14-1706 TSZ

ORDER

THIS MATTER comes before the Court on a motion for partial summary judgment brought by plaintiff The Standard Fire Insurance Company ("Standard"), docket no. 30. Having considered all papers filed in support of and in opposition to the motion, including the supplemental briefs submitted by the parties at the Court's request, as well as the oral arguments of counsel at the hearing held on July 14, 2015, the Court enters the following order.

**Background**

In this action, Standard seeks a declaratory judgment that, under the insurance policy at issue, it owes no duty to defend or indemnify the Port of Bellingham (the "Port") in connection with wrongful death counterclaims asserted against the Port by the estates of Jim (James) A. Langei and Sterling Taylor, husband and wife (collectively,

ORDER - 1

1  the "Estates").  Langei and Taylor died on March 30, 2012, when their vessel, the

2  M/Y BREAKWIND, on which they were residing, was destroyed by fire and sank into

3  the navigable waters of Bellingham's Squalicum Harbor.  At the time, the vessel was

4  moored in the G East Boathouse in the Squalicum Marina, along with eleven (11) other

5  non-commercial yachts, including one christened the MENTAL FLOSS, which was

6  owned by Randle Carr and insured under a yacht policy issued by Travelers Property

7  Casualty Companies through Standard (the "Standard Policy"), Ex. 2 to Purdy Decl.

8  (docket no. 31-2).

9        In November 2014, the Estates filed wrongful death counterclaims against the

10  Port, alleging that (i) the Port and/or its contractors negligently caused the fire, and/or

11  (ii) the Port was negligent in failing to provide the Squalicum Marina with adequate fire

12  suppression equipment.  Am. Answer, Counterclaim, & 3d-Party Compl. (C12-946,

13  docket nos. 110 & 111).[1]  The Port, which was identified an "additional insured" on the

14  Standard Policy, tendered defense of these wrongful death counterclaims to Standard.

15  Standard accepted defense under a reservation of rights, and now seeks a ruling that it

16  owes no continuing duty to defend.

17

18

19
_____

20  [1] The Estates amended their pleadings after the Court decided the Port's motion seeking a ruling that the
    Estates' failure to plead the wrongful death claims as compulsory counterclaims in Case No. C12-946
21  barred the Estates from pursuing such claims in state court.  See Order (C12-946, docket no. 74).  The
    Court interpreted the Port's motion as essentially requesting an injunction against the litigation then
    pending in Whatcom County Superior Court and made clear that the Court could not grant such relief.  Id.
22  at 9 (citing the Anti-Injunction Act, 28 U.S.C. § 2283).  In light of the risks associated with proceeding
    forward in both forums simultaneously, the Estates have chosen to prosecute their wrongful death claims
23  here rather than in state court.

1  **Discussion**

2          To prevail on its motion for summary judgment, Standard must show that no

3  genuine issue of material fact exists and that it is entitled to judgment as a matter of law.

4  Fed. R. Civ. P. 56(a); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The Court

5  is not persuaded that Standard has demonstrated a right to judgment as a matter of law.

6  In the absence of a federal statute or judicially-fashioned admiralty rule or a need for

7  uniformity in admiralty practice, state law governs with respect to maritime insurance

8  matters.  <u>See</u> <u>Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc.</u>, 518 F.3d

9  645, 649 (9th Cir. 2008) (citing <u>Wilburn Boat Co. v. Fireman's Fund Ins. Co.</u>, 348 U.S.

10  310 (1955)); <u>see also</u> <u>Bohemia, Inc. v. Home Ins. Co.</u>, 725 F.2d 506, 509-10 (9th Cir.

11  1984); <u>John Deere Ins. Co. ex rel. Int'l Specialty, Inc. v. Smith Lighterage Co.</u>, 948 F.

12  Supp. 947, 949 (W.D. Wash. 1996).  The parties appear to agree that Washington law

13  governs in this case.[2]

14          Under Washington law, the duty to defend is different from and broader than the

15  duty to indemnify.  <u>Am. Best Food, Inc. v. Alea London, Ltd.</u>, 168 Wn.2d 398, 404,

16  _____

17  [2] Washington courts construe insurance policies as a whole, giving the policy the "fair, reasonable, and
18  sensible construction" that an average person purchasing insurance would.  <u>Vision One, LLC v. Phila.</u>
   <u>Indem. Ins. Co.</u>, 174 Wn.2d 501, 512, 276 P.3d 300 (2012); <u>see also</u> <u>Panorama Vill. Condo. Owners</u>
   <u>Ass'n Bd. of Dirs. v. Allstate Ins. Co.</u>, 144 Wn.2d 130, 137, 26 P.3d 910 (2001).  Inclusionary clauses are
19  liberally construed in favor of coverage, while exclusionary provisions are interpreted strictly against the
   insurer.  <u>Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia</u>, 379 F.3d 557, 560 (9th Cir. 2004)
20  (summarizing Washington law).  If the language of a policy is "clear and unambiguous," the Court must
   "enforce it as written and may not modify it or create ambiguity where none exists."  <u>Weyerhaeuser Co. v.</u>
21  <u>Commercial Union Ins. Co.</u>, 142 Wn.2d 654, 666, 15 P.3d 115 (2000).  On the other hand, if a provision
   is ambiguous, the Court may rely on extrinsic evidence of the parties' intent to interpret the clause, and
22  may resolve any remaining ambiguities against the insurer as the drafter of the policy.  <u>Id.</u>  A term of an
   insurance contract is ambiguous when it is "fairly susceptible" to being interpreted in two different ways,
   both of which are reasonable.  <u>Id.</u>  In this case, no argument has been made that the policy provisions at
23  issue are in any way ambiguous.

1   229 P.3d 693 (2010).  Although the duty to indemnify arises only if the policy "*actually*

2   *covers*" the insured's liability, the duty to defend is triggered if the policy "*conceivably*

3   *covers*" the allegations in the underlying complaint.  *Id.* (emphasis in original); *see*

4   *also* *Expedia, Inc. v. Steadfast Ins. Co.*, 180 Wn.2d 793, 802, 329 P.3d 59 (2014).  In

5   evaluating whether the insurer owes a duty to defend, the Court must liberally construe

6   the underlying complaint to determine whether the alleged facts could, if proven, impose

7   liability on the insured that would be covered under the policy.  *Expedia*, 180 Wn.2d at

8   802-03; *Am. Best Food*, 168 Wn.2d at 404-05 (citing *Truck Ins. Exch. v. VanPort Homes,*

9   *Inc.*, 147 Wn.2d 751, 58 P.3d 276 (2002)).  The analysis must ordinarily be performed

10  within the "eight corners" of the insurance contract and the underlying complaint, but this

11  rule has two exceptions:  (i) if coverage is not obvious from the face of the complaint but

12  could exist, the insurer must investigate and give the insured the benefit of the doubt

13  concerning the duty to defend; and (ii) if the allegations in the complaint are ambiguous

14  or conflict with facts known to the insurer, facts outside the complaint may be

15  considered.  *Expedia*, 180 Wn.2d at 803-04.  Extrinsic facts, however, may only be used

16  to trigger the duty to defend; they may not be used to deny coverage.  *Id.* at 804.  If "any

17  reasonable interpretation of the facts or the law" could result in coverage, the insurer

18  must defend.  *Am. Best Food*, 168 Wn.2d at 405.

19         Under the Standard Policy, the insurer is required to "pay those sums that the

20  insured becomes legally obligated to pay as damages because of bodily injury or property

21  damage caused by an occurrence to which this insurance applies."  Standard Policy at

22  § 6.A (docket no. 31-2 at 28).  The Standard Policy further provides that the insurer

23

1   "will pay damages for bodily injury or property damage for which an insured is legally

2   responsible arising out of owning, maintaining or using" the MENTAL FLOSS.  *Id.* at

3   § 6.A.1.  The term "insured" is defined as Carr, a resident of his household who is related

4   to him by blood, marriage, or adoption, and any person while operating his yacht for

5   private pleasure without charge and with his permission.  *Id.* at Definitions (docket

6   no. 31-2 at 22).  The Standard Policy identifies the Port as an additional insured, but

7   "only for the liability arising out of the negligence of the insured."  *Id.* at Additional

8   Insured Endorsement (docket no. 31-2 at 11).

9          Standard contends that it owes no duty to defend the Port because the claims of the

10  Estates against the Port are not premised on the negligence of Carr.  The Estates allege

11  that the Port had a duty to supervise Dutra Construction Co., Inc. ("Dutra") and its

12  subcontractors, including Elite Electrical Contractors, Inc. ("Elite"), that the Port (as well

13  as Dutra and Elite) failed to properly repair, inspect, or have inspected the electrical

14  system at Gate 3 (which is near the G East Boathouse), that the Port "did not take

15  adequate steps to assure a fire in the marina could be adequately addressed by the fire

16  suppression tools available in the marina," and that the Port spoliated certain materials.

17  Am. Answer, Counterclaim, & 3d Party Compl. at ¶¶ 3.1, 3.11, 3.18, 3.19, 3.21, & 4.1-

18  4.7 (C12-946, docket nos. 110 & 111).  In essence, the Estates claim that the Port is liable

19  for negligent supervision of Dutra and Elite, negligence with respect to the cause and

20  containment of the fire, and misconduct in connection with the evidence.  The Estates

21  make no assertion that the Port is vicariously liable for Carr's acts or omissions.  Thus,

22

23

ORDER - 5

the "eight corners" of the Standard Policy and the Estates' counterclaims support the

conclusion that Standard owes no duty to defend the Port in the wrongful death action.

The Port asserts, however, that the Court should not limit its analysis to the

"eight corners" of the Standard Policy and the operative pleading, but rather should

consider extrinsic evidence, which can come into play if the allegations in the complaint

are ambiguous or conflict with facts known to the insurer.  *See* *Expedia*, 180 Wn.2d at

803-04.  The Port does not rely on the ambiguity prong of this test, but rather contends

Standard is aware of information that is inconsistent with what the Estates have alleged in

their wrongful death counterclaims, namely evidence tending to place blame for the fire

on Carr.[3]  To be clear, the Port does not contend that it would have vicarious liability for

---

[3] According to the Port's expert, Abid Kemal, Ph.D., the fire at issue likely originated inside the G East Boathouse on a vessel or slip to the east of the M/Y BREAKWIND, which was in the last slip on the west end of the G East Boathouse.  Kemal Decl. at ¶ 10, Ex. 7 to Matison Decl. (C12-1829, docket no. 144-6). The slips in the G East Boathouse were arranged as follows:

| | 2 | 4 | 6 | 8 | 10 | 12 | 14 | 16 | 18 | 20 | 22 | 24 | 26 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WEST | Langei | Smith | Dodge | Cahalan | Deets | Osterloh | Troupin | Carr | Roberts | Ringler | Schjelderup | Peterson | Ershig | EAST |

*See* Ex. 5 to Matison Decl. (C12-1829, docket no. 144-4); *see also* Amended SAR F(5) Claims at § III.B (C12-1829, docket nos. 61-69); Complaint at ¶ 12 (C12-1556, docket no. 1); Complaint at ¶¶ 11-12 (C15-60, docket no. 1).  Dr. Kemal and his colleague, John Loud, P.E., have ruled out as a source of the fire the Port of Bellingham's electrical equipment, which was located on the exterior of the west wall of the G East Boathouse.  Kemal Decl. at ¶ 3 (docket no. 144-6 at 51-52); Loud Decl. at ¶¶ 6-10, Ex. 6 to Matison Decl. (C12-1829, docket no. 144-5).  Consistent with Dr. Kemal's opinion that the fire traveled from east to west, Mr. Loud has identified a number of fire hazards that existed in the slips east of the M/Y BREAKWIND, including various appliances that were in use and left unattended on some of the other vessels.  Loud Decl. at ¶¶ 21-23.  Carr himself has acknowledged that, at the time of the fire, the battery charger and refrigerator on his vessel were on and drawing shore power, and that he stored one or more cans of paint thinner on board the MENTAL FLOSS.  R. Carr Dep. at 21:5-9, Ex. B to S. Carr Decl. (docket no. 41 at 8); Resp. to Req. for Adm. No. 33, Ex. C to S. Carr Decl. (docket no. 41 at 26).

any negligence on Carr's part.[4]  Rather, the Port argues that any liability it might have for

failing to provide adequate fire suppression tools would be causally related to Carr's

negligence if his actions or omissions started the fire.  In essence, the Port reasons that,

but for the fire, which might have originated on Carr's vessel,[5] any deficiencies in the fire

suppression system would not have resulted in or contributed to the deaths of Langei and

Taylor.  According to the Port, this "but for" relationship between the Carr's alleged

negligence and the Estates' poor-fire-suppression claim against the Port gives rise to a

duty on Standard's part to provide a defense.

In advancing this theory, the Port relies on the policy language indicating that

Standard will cover the Port for liability "arising out of" Carr's negligence.  _See_ Standard

Policy at Additional Insured Endorsement (docket no. 31-2 at 11).  The Port contends that

the Court must consider the broad meaning ascribed to the phrase "arising out of" in the

insurance context.  _See_ _Equilon Enters. LLC v. Great Am. Alliance Ins. Co._, 132 Wn.

App. 430, 437-38, 132 P.3d 758 (2006) (observing that "arising out of" is construed to

connote "a 'natural consequence' level of causation," "broadly link[ing] a factual

situation with the event creating liability," and requiring "only a minimal causal

---

[4] Carr is not an agent of the Port, and even if he was found responsible for the fire, the Port would not, as a result, be liable.  Rather, the trier of fact would be required to apportion fault, and the Port would be liable for its own negligence and/or misconduct.  If the Port was determined to be a joint tortfeasor, then the Estates could collect the entire amount of any judgment from the Port, leaving the Port to seek contribution from the other joint tortfeasors, including conceivably Carr.  _See_ Minute Order (C12-946, docket no. 175; C12-1829, docket no. 153) (concluding that _McDermott, Inc. v. AmClyde_, 511 U.S. 202 (1994), does not govern).

[5] Although the Port also asserts that the fire might have started in the G East Boathouse, because the Port points to the MENTAL FLOSS itself as a possible source of the fire, the Court need not address whether the Standard Policy covers Carr's liability with respect to both the vessel and the G East Boathouse or only as to the vessel.

ORDER - 7

connection or incidental relationship").  Washington courts consider the words "arising out of" to be clear and unambiguous, and to encompass more than the alternative phrases "caused by" or "resulting from."  _Australia Unlimited, Inc. v. Hartford Cas. Ins. Co._, 147 Wn. App. 758, 774, 198 P.3d 514 (2008).  Under Washington law, "arising out of" means "originating from," "having its origin in," "growing out of," or "flowing from," and it is not synonymous with "proximately caused by."  _Id._

The Court is persuaded that the Port is entitled to introduce Carr's possible fault by way of extrinsic evidence, _Expedia_, 180 Wn.2d at 803-04,[6] and that the broad inclusionary clause[7] set forth in the additional insured endorsement imposes a duty on Standard to continue to defend the Port as to the Estates' claim that the Port is liable for failing to provide effective fire suppression equipment.  _Equilon_, which involved a similar "additional insured" provision, dictates this result.  In _Equilon_, Great American Alliance Insurance Company ("Great American") issued a commercial general liability ("CGL") policy that covered the additional insured, Equilon Enterprises LLC, doing

---

[6] Although involving Maryland, rather than Washington, law, _Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's London_, 788 F.3d 375 (4th Cir. 2015), supports this conclusion.  In _Capital City_, a contractor engaged a subcontractor, Marquez Brick Work, Inc. ("Marquez"), in connection with renovations to a building.  The contractor was later sued for damage to an adjoining building, and it tendered the claim to the Underwriters at Lloyd's London ("Underwriters"), which had issued a general commercial liability insurance policy to Marquez, listing the contractor as an additional insured.  The underlying complaint against the contractor did not mention Marquez, and the Underwriters denied coverage.  The Fourth Circuit concluded that the contractor, "as the additional insured, is entitled to introduce Marquez's involvement by way of extrinsic evidence."  _Id._ at 383.

[7] In contrast, in a related case involving a boat and personal watercraft policy issued by Progressive Classic Insurance Company ("Progressive"), the inclusionary provision did not contain the phrase "arising out of," but rather indicated that Progressive "will pay damages . . . for which an insured person becomes legally responsible because of an accident."  Progressive Policy at Part I (C15-473, docket no. 12-5 at 10).  The words "arising out of" appeared only in the exclusions.  _Id._ at Exclusions (C15-473, docket no. 12-5 at 11-13).  Thus, with respect to the Progressive Policy, liberally interpreting the "arising out of" language would not have assisted the Port.

business as Shell Oil Products US ("Shell"), for "liability arising out of" the insured's

operations or premises.  132 Wn. App. at 434.  The insured was a fuel distributor that

contracted with service stations to deliver Shell fuel for retail sale.  _Id._ at 433.  The

contract between Shell and the fuel distributor allowed the fuel distributor to use Shell

signs at service stations selling Shell fuel.  _Id._

At one of these service stations, namely the South Seattle Market (the "Market"),

an adolescent male was severely beaten by several youths loitering in the parking lot.  _Id._

at 434.  The assault victim sued the Market and Shell, but not the fuel distributor.  _Id._ at

434-35.  Shell tendered the claim to Great American, which denied coverage on the

grounds that the underlying complaint did not mention the fuel distributor, refer to the

fuel distributor's operations or premises, or make allegations arising out of the fuel

distributor's operations or premises.  _Id._  Providing its own defense, Shell moved for

summary judgment, but the trial court refused to dismiss the claim against Shell, which

was premised on apparent agency, because the evidence suggested that, at the time of the

attack, the assault victim believed the Market was a Shell station and would therefore

have adequate security.  _Id._ at 435.  Shell settled with the assault victim and then filed a

declaratory judgment action against Great American.  _Id._  The Washington Court of

Appeals ruled that Great American had a duty to defend and indemnify Shell.  _Id._ at 436-

41.

In _Equilon_, Great American argued that Shell's liability did not "arise out of" the

fuel distributor's operations, which did not include providing security at the Market, and

was therefore not covered.  _Id._ at 439.  The _Equilon_ Court disagreed, reasoning that the

1   placing of Shell signs at the Market, pursuant to the contracts between the fuel distributor

2   and Shell and between the fuel distributor and the Market, was an "aspect" of the fuel

3   distributor's "ongoing operations." *Id.*  It further concluded that Shell's liability arose

4   out of the presence of the Shell signs, and therefore arose out of the fuel distributor's

5   operations. *Id.*  In interpreting the phrase "arising out of" in this broad way, the

6   Washington Court of Appeals observed that, if Great American had wanted to insure

7   Shell only for injuries (as opposed to liability) arising out of the fuel distributor's

8   operations, it could have worded the additional insured endorsement differently. *Id.* at

9   436 & n.2 (noting that other CGL policies have limited coverage to "liability specifically

10  resulting from the conduct of the Named Insured which may be imputed to the Additional

11  Insured" or to "liability arising out of the named insured's ongoing operations performed

12  for the additional insured.").

13          Given the tenuous connection deemed sufficient in *Equilon* to satisfy the "arising

14  out of" standard, the Court cannot conclude, as a matter of law, that Standard has no duty

15  to defend the Port.  In *Equilon*, as in this case, the injured party did not name the insured

16  as a defendant.  In *Equilon*, however, unlike in this case, the insured was not alleged to

17  have had any direct involvement in causing the injury; the fuel distributor was not

18  responsible for security at the Market and it played no role in instigating or failing to stop

19  or prevent the assault.  Carr, on the other hand, is suspected by the Port of being at least

20  partially at fault in starting the fire that led to the deaths of Langei and Taylor.  Thus, in

21  comparison to *Equilon*, in this case, the relationship between the additional insured's

22  potential liability and the named insured's conduct is stronger.

23

ORDER - 10

1    Standard's argument that the Port's alleged negligence in connection with the fire

2    suppression system predated the fire, and thus could not have "arisen out of" Carr's

3    negligence, misses the mark.  The Standard Policy covers the Port's liability,[8] not its

4    negligence, and the phrase "arising out of" requires no temporal or causal relationship

5    between Carr's negligence and the Port's liability.  Given the Port's theory that, absent a

6    fire, the alleged deficiencies in the fire suppression system would not have contributed to

7    the deaths of Langei and Taylor, the Court cannot say, as a matter of law, that the Port's

8    liability does not "conceivably," <u>*see* *Am. Best Food*</u>, 168 Wn.2d at 404, "arise out of" or

9    "flow from," <u>*see* *Australia Unlimited*</u>, 147 Wn. App. at 774, negligence on Carr's part.

10   Whether Standard would be required, however, under the terms of the Standard Policy,

11   to indemnify the Port, as opposed to providing it a defense, is a question for another day.

12   **<u>Conclusion</u>**

13   For the foregoing reasons, Standard's motion for partial summary judgment,

14   docket no. 30, is DENIED.

15   IT IS SO ORDERED.

16   Dated this 19th day of October, 2015.

17

18   _____
     Thomas S. Zilly
19   United States District Judge

20   _____

21   [8] In contrast, the Standard Policy covers Carr to the extent that he is "legally obligated to pay" or "legally
     responsible" for "damages because of [or for] bodily injury or property damage."  Standard Policy at
22   §§ 6.A & 6.A.1 (docket no. 31-2 at 28).  As is apparent from these inclusionary clauses, Standard knows
     how to use more narrow and precise language than "liability arising out of the negligence of the insured,"
23   but it chose for whatever reason not to do so in the Additional Insured Endorsement.

ORDER - 11